IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TEMPLE UNIVERSITY | : | |
| HOSPITAL, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 16-2645 |
| RUSSELL REIMBURSEMENT | : | |
| ADVISORS, INC., et al. | : | |

MEMORANDUM

Legrome D. Davis, J.                                               March 15, 2017

Plaintiff Temple University Hospital, Inc. ("TUH") sues Defendant National Railroad

Passenger Corp. ("Amtrak") for breach of contract, asserting that Amtrak is obligated to pay

$1,628,095.28 for inpatient hospital services that TUH provided to a passenger of the Amtrak

train 188, which derailed in Philadelphia on May 12, 2015.[1]  Second Am. Compl. (ECF 35).  In

addition, TUH sues Defendants Russell Reimbursement Advisors, Inc. ("RRA") and MCMC,

L.L.C. ("MCMC"), asserting that they acted as agents for Amtrak.  TUH's Complaint asserts that

RRA's and MCMC's conduct, which was authorized by Amtrak, created a contract binding

Amtrak to a promise to pay TUH the sum demanded.  Alternatively, if Amtrak did not authorize

the making of that promise, the Complaint asserts that RRA and MCMC are individually liable,

and Amtrak is liable because it ratified their unauthorized promise.  RRA and MCMC jointly

move and Amtrak separately moves to dismiss the action for "failure to state a claim upon which

relief can be granted."  Fed. R. Civ. P. 12(b)(6); Defs. Mots. (ECF 37, 38)  TUH opposes

dismissal.  TUH Resps. (ECF 40, 41).[2]  Jurisdiction is diversity, 28 U.S.C. § 1332.

---

[1]  After the derailment, TUH treated and separately billed other passengers who were not hospitalized.
Amtrak paid TUH's charges for those medical services.
[2]  In addition, RRA and MCMC sue Amtrak for contribution and indemnity.  Third-Party Compl. (ECF
20).  Amtrak moves under Federal Rule of Civil Procedure 12(c) for judgment on the third-party
pleadings.  Amtrak Answer & R. 12(c) Mot. (ECF 25, 38).  RRA and MCMC oppose judgment on the
third-party pleadings.  Defs. Resp. (ECF 39).  Decision on Amtrak's Rule 12(c) motion will be reserved.

The principal inquiry here is whether the Second Amended Complaint provides "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face,'" as is required by the Supreme Court's decisions in Iqbal and Twombly.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  In essence, "we look for well-pled factual allegations, assume their veracity, and then 'determine whether they plausibly give rise to an entitlement to relief.'"  Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012) (quoting Iqbal, 556 U.S. at 679); Santiago v. Warminster Twp., 629 F.3d 121, 129-30 (3d Cir. 2010).  That inquiry "is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 679).

Here, the Second Amended Complaint is viewed within a broader context than this action alone.  After Amtrak's train derailed on May 12, 2015, various health facilities provided urgent medical and rehabilitative services to injured passengers.  The Complaint alleges, and the parties do not dispute, that during May 13, 2015, through July 28, 2015, TUH provided inpatient hospital care for 14 of the injured passengers, including the passenger ("A.L.") whose bill for medical services is at the core of this dispute.  Second Am. Compl. ¶¶ 9, 12.

Many lawsuits ensued from the derailment.  On October 13, 2015, the Judicial Panel on Multidistrict Litigation consolidated in this Court all related actions originally filed in and transferred or removed to this Court.  In re Amtrak Train Derailment, No. 15-md-2654 (E.D. Pa. 2015) (the "MDL").  On October 27, 2016, the Court approved a global resolution of the MDL.  Case Mgmt. Order, dated Nov. 3, 2016 (ECF 145).  Amtrak accepted liability in the MDL for

compensatory damages and agreed to fund a settlement program.  Id.  The money available to compensate the many injured passengers is limited by a cap on Amtrak's liability arising "from a single accident."  49 U.S.C. § 28103(a)(2).  A.L. is a plaintiff in the MDL who has agreed to participate in the settlement program.

Immediately after the derailment, Amtrak voluntarily paid for urgent medical treatment of the injured passengers.  However, Amtrak preserved all rights and full control over which medical services and what proportion of the services that it would pay gratuitously.  TUH's Complaint alleges, and the parties do not dispute, that Amtrak chose to not pay TUH the demanded sum of $1,628,095.64.  Second Am. Compl. ¶¶ 26, 29.  The Complaint alleges, and the parties do not dispute, that Amtrak paid TUH the sum of $2,754,228.49 for inpatient hospital services provided to 13 of the injured passengers, other than A.L.  Amtrak Br. at 5 (ECF 38-1).

TUH acknowledges that A.L. was insured by Medicare.  TUH Resp. (ECF 41 at 6, 8 n.5). A.L. had no other health insurance.  TUH submits that Medicare would have paid about $265,469.08 for the inpatient hospital services provided to A.L.  Id.  TUH acknowledges that it did not receive any Medicare insurance proceeds for the services provided to A.L., because TUH did not timely submit a claim to Medicare within the required one-year period from the date that the inpatient hospital services were provided.  Id.

I.    PROCEDURAL BACKGROUND

On May 27, 2016, TUH commenced this action by filing a complaint against RRA and MCMC, suing to recover payment for the inpatient hospital services provided to A.L.  Compl. (ECF 1).  The complaint was dismissed for failure to state a claim.  Order, dated Sept. 6, 2016 (ECF 11) (ruling that the "Complaint fails to put Defendants on notice of the claims asserted against them, and improperly leaves Defendants as well as the Court guessing which particular

claims are being asserted.").  On September 8, 2016, TUH filed an amended pleading, again

suing to recover payment for A.L.'s bill from RRA and MCMC.  First Am. Compl. (ECF 12).

The first amended complaint survived RRA's and MCMC's motion to dismiss.  Order, dated

Nov. 21, 2016 (ECF 17).  TUH was permitted to again amend the pleadings.  Order, dated Jan.

31, 2017 (ECF 31).  On February 1, 2017, TUH amended the pleadings by adding Amtrak as a

defendant and suing to recover payment for A.L.'s bill from Amtrak.  Second Am. Compl. (ECF

35).  TUH acknowledges that "the causes of action against RRA and MCMC are identical in the

first and second amended complaints."  TUH Resp. (ECF 41 at 3-4).  On February 17, 2017,

RRA and MCMC filed the present dismissal motions.  Defs. Mots. (ECF 37, 38).

The dismissal motions filed by RRA, MCMC, and Amtrak attach a copy of a "Letter of

Agreement," signed by TUH and RRA on October 23, 2015 (the "Letter").  R&M Mot. (ECF 37-

2); Amtrak Mot., Ex. E (ECF 38-4 at 6-8).  TUH did not attach a copy of the Letter to any of its

pleadings.  In addition, Amtrak's dismissal motion attaches email exchanges among various

representatives for TUH, RRA, and MCMC.  Id., Exs. D, F, G (ECF 38-4 at 2-15).  The emails

document the parties' discussion about the charges billed by TUH during May 13, 2015, through

July 28, 2015, for the 14 injured passengers that TUH treated as inpatients, including A.L.

Specifically, the Letter and the emails document the following communications.

On Thursday, October 22, 2015, at 4:47 p.m., Brenda G. Calia, Sr. Vice President of

MCMC, emailed E. Patrick Clarke and Deborah Scialanca of Amtrak, attaching a worksheet.

Amtrak Br., Ex. D (ECF 38-4 at 2-4).  Calia wrote that the "worksheet came from Temple to

Russell [RRA]."  Id.  The worksheet summarized charges billed by TUH for the 14 injured

passengers that TUH treated as inpatients.  In line-itemized entries for each patient, the

worksheet listed TUH's "Total Charges" and the "Amtrak Settlement offer (75% chgs)."  Id.

Among other entries, the worksheet listed the total amount of charges billed for all 14 patients, discounted by 25%: "$4,382,324.13" (75% of the total charges billed).  Id.  The worksheet listed the discounted amount for A.L.: "$1,628,095.64."  Id.  However, Calia noted that charges billed for five of the patients had not been submitted by Amtrak for negotiation.  Instead, TUH had listed the charges billed for those five patients on the worksheet and had submitted the worksheet to RRA.  The charges billed for A.L. was one of the five bills that TUH unilaterally chose to list on the worksheet.  Calia wrote that RRA and MCMC "understand that these bills may not be allowable because they did not come from us (and ultimately, approved by you, Amtrak)."  Id.  Calia also wrote:  "In following our protocol, only bills that were received from Amtrak (initialed and authorized for payment) can be processed."  Id.  Calia asked Clarke and Scialanca for further instructions.

On October 22, 2015, at 6:16 p.m., Amtrak's representative, Scialanca, responded and instructed MCMC's representative, Calia:  "I'm not sure why A.L.'s bill is listed as we have written on all his bills 'do not pay.'"  Amtrak Br., Ex. D (ECF 38-4 at 2-4).  On October 22, 2015, at 8:15 p.m., Calia responded to Scialanca:  "Temple sent those bills directly to [RRA] as they were negotiating with [RRA] on other Amtrak bills.  I suspected they were skirting the process we have in place, hence, why I was inquiring about those bills."  Id.  "We will let Temple know the bills for A.L. will not be included in our negotiations."  Id.

On Friday, October 23, 2015, TUH's representative and RRA's representative, Christy Salas, signed the "Letter of Agreement," which "sets forth the agreement of the Parties with respect to certain services provided by [TUH]."  Amtrak Br., Ex. E (ECF 38-4 at 6-8).  Those services were summarized in Exhibit A to the Letter.  In substance, Exhibit A listed the same information that was listed earlier on the worksheet.  In line-itemized entries for each patient,

Exhibit A listed the "Total Charges" billed by TUH, and the "Amtrak Settlement offer (75%

chgs)."  Id.  Exhibit A listed the total amount of charges billed for all 14 patients, discounted by

25%:  "$4,382,324.13" (75% of the total billed charges).  Id.  Exhibit A listed the discounted

amount for A.L.:  "$1,628,095.64."  Id.  On its face, the Letter stated that it was "effective as of

October 26, 2015."  Id.

On October 23, 2015, at 6:34 p.m., MCMC's representative, Calia, emailed RRA's

representative, Salas, stating:  "Amtrak DOES NOT want ANY of A.L. bills paid."  Amtrak Br.,

Ex. E (ECF 38-4 at 11-13).  Calia attached the emails sent the day before on October 22, 2015,

highlighting in red Amtrak's earlier instructions that A.L.'s bills were not to be paid.

On Monday, October 26, 2015, at 9:02 a.m., RRA's representative, Salas, emailed TUH's

administrative director for patient accounts, Philip Palma.  Amtrak Br. at 5 (ECF 38-4 at 15).

Salas wrote:  "I heard back from Amtrak regarding the 5 outstanding bills you sent.  The only

bill in question is the $2m bill for A.L.  Amtrak is not paying any of his bills at this time."  Id.

II.    Allegations of the Second Amended Complaint and the Parties' Contentions

TUH's Complaint asserts that Amtrak "retained" RRA and MCMC "to act as its agents to

negotiate the payment of the charges incurred by certain patients who were treated by TUH."

Second Am. Compl. ¶ 9.  The Complaint asserts that on October 23, 2016, representatives of

RRA and MCMC "signed a written agreement" promising to pay TUH $4,382,324.13 for the

medical services that TUH provided to the 14 injured passengers, which total included the sum

of $1,628,095.28 for the inpatient hospital services provided by TUH to A.L.  Id. ¶ 12.

As to whether RRA and MCMC acted within the scope of their authority as agents for

Amtrak, the Complaint asserts alternative claims.  Count III of the Complaint asserts that RRA

and MCMC had Amtrak's authority to "enter into the agreement with TUH."  Second Am.

Compl. ¶ 28.  The "agreement" was a promise to pay TUH $4,382,324.13 in total for the inpatient hospital services that TUH provided to the 14 injured passengers, which total included the sum of $1,628,095.28 for the inpatient hospital services provided by TUH to A.L.  Id. ¶¶ 12, 28.  And, it is also asserted, Amtrak is bound by that "written agreement."  Id. ¶ 28.

Alternatively, Count I of the Complaint asserts that Amtrak's "agents," RRA and MCMC, "exceeded the scope of their authority for Amtrak."  Second Am. Compl. ¶¶ 9, 12, 17.  The Complaint alleges that on October 22, 2015, RRA and MCMC "proposed to Amtrak that Amtrak pay TUH $4,382,324.13" for the inpatient hospital services that TUH provided to the 14 injured passengers.  Id. ¶ 10.  The Complaint also alleges that on October 22, 2015, Amtrak "told" RRA and MCMC that "they were not authorized to enter into the proposed agreement and that Amtrak would agree to pay only $2,754,228.49 for thirteen (13) of these patients."  Id. ¶ 11.  The Complaint asserts that on October 23, 2015, RRA acted without Amtrak's authority by "sign[ing] a written agreement" promising to pay TUH $4,382,324.13 for the services that TUH provided to all 14 injured passengers, which total included the sum of $1,628,095.28 for the services provided to A.L.  Id. ¶¶ 9, 12.  And, it is asserted, RRA and MCMC are bound by that agreement and "are liable to TUH for their unauthorized conduct."  Id. ¶ 17.

In addition, TUH's Complaint asserts that even if RRA and MCMC acted beyond the scope of their authority as agents for Amtrak by entering into the agreement promising to pay for the inpatient hospital services provided to A.L., Amtrak "ratified the unauthorized conduct" by paying TUH "$2,754,228.29 pursuant to the terms of that agreement."  Second Am. Compl. ¶ 24.  And, the Complaint asserts, Amtrak affirmed and is bound by the unauthorized promise contained in the "agreement" signed by RRA.  Id. ¶¶ 12, 24-25.

Amtrak maintains that it never agreed to pay for the inpatient hospital services that TUH provided to A.L.  Amtrak Br. at 3, 10 (ECF 38-1).  Amtrak also maintains that it did not ever authorize RRA or MCMC to negotiate or agree to pay for the inpatient hospital services provided A.L.  Id. at 3, 9.  Amtrak acknowledges that it hired MCMC to "negotiate medical bills incurred by injured passengers at various health care facilities," including TUH.  Id. at 4.  However, Amtrak asserts that it did not hire RRA and did not even know of its existence until this dispute arose.  Id. at 5 ("At the time the [Letter of ] Agreement was signed, Amtrak was unaware that RRA even existed, much less was negotiating on its behalf.").  The record does not establish whether RRA is subsidiary or affiliate of MCMC, or a subcontractor, or some other entity.  See id. at 5 n.2 ("RRA is apparently owned by the same parent corporation as MCMC.").

Furthermore, Amtrak maintains that it did not affirm or ratify any promise or conduct by either RRA or MCMC as to TUH's charges for the inpatient hospital services provided to A.L.  Amtrak asserts that it "promptly disavowed and clearly repudiated" any purported agreement by RRA or MCMC to pay for the services provided to A.L.  Amtrak Br. at 3, 10.  Amtrak also maintains:  "At no time did Amtrak manifest any intention to pay A.L.'s bill or act in any way inconsistent with its disaffirmance as to paying A.L.'s bill."  Id. at 10 (internal quotation marks and alteration omitted).  Furthermore, Amtrak contends that its payment of the charges billed for the other 13 injured passengers, "did not obligate Amtrak to pay A.L.'s bill."  Id.

RRA and MCMC seek dismissal of TUH's claim for breach of contract based principally on two asserted defects.  R&M Br. (ECF 37 at 3-18).  They maintain that TUH has not alleged the existence of an enforceable contract.  Id. at 2, 8-12.  Specifically, they maintain that the Complaint does not allege any facts that would constitute consideration for the pled agreement to pay for the inpatient hospital services provided by TUH to A.L.  This is so, they maintain,

because the Complaint alleges, and the parties do not dispute, that TUH had already provided the services to all 14 of the hospital inpatients at the time the Letter was signed.  RRA and MCMC maintain that past consideration, as a matter of law, cannot support an enforceable contract.  Id. And, they assert:  "TUH does not allege that it provided the medical services as a condition of, or with the expectation of, any payment by Amtrak."  Id. at 8, 12.  TUH does not allege otherwise.

RRA and MCMC also seek dismissal of the Complaint's claim that they misrepresented their authority as agents for Amtrak.  Second Am. Compl. ¶¶ 13, 17, 21; R&M Br. at 2, 12-13, 14-15.  RRA and MCMC acknowledge that RRA's representative, Salas, lacked Amtrak's authorization to sign the Letter, and RRA and MCMC lacked authority to enter into any agreement for the payment of A.L.'s inpatient hospital services.  However, they maintain that the Complaint fails to allege the existence of an enforceable contract, which is a necessary element of the Complaint's cause of action for breach of an implied warranty of authority.  Id. at 12-13. In addition, they maintain, the Complaint "fails to allege that [TUH] relied to its detriment on any representation made by RRA and MCMC," which detrimental reliance or prejudice is an element of any asserted cause of action for tortious misrepresentation.  Id. at 2, 14-15.

III.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a claim for "failure to state a claim upon which relief can be granted."  Accordingly, a Rule 12(b)(6) dismissal motion tests the sufficiency of claims contained in a complaint against Rule 8(a)'s pleading requirements.

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678 (citing Twombly, 550 U.S. at 556).  The "touchstone" of the pleading standard is plausibility:

> "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 678).  Accord Argueta v. U.S. Immigration & Customs Enf't, 643 F.3d 60, 70-73 (3d Cir. 2011); Santiago, 629 F.3d at 129-30; Fowler v. UPMC Shadyside, 578 F.3d 203, 209-11 (3d Cir. 2009).

Under Rule 12(b)(6), the well-pled factual allegations of a complaint must not only be accepted as true, but also all reasonable inferences from those allegations must be drawn in the plaintiff's favor.  In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 633 (3d Cir. 2017) (citing Iqbal, 556 U.S. at 678); Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd., 836 F.3d 261, 264 n.1, 268 (3d Cir. 2016) (citing Fowler, 578 F.3d at 210).  Whereas "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, "a plaintiff 'need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 147 (3d Cir. 2014) (quoting Fowler, 578 F.3d at 213 (citations and quotation marks omitted)).  However, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing

Twombly, 550 U.S. at 555).  And legal conclusions must be disregarded.  Horizon, 846 F.3d at

633 (citing Santiago, 629 F. 3d at 128).

>    B.    The Record on the Dismissal Motions

For purposes of Rule 12(b)(6), "a court 'must consider only the complaint, exhibits

attached to the complaint, matters of public record, as well as undisputedly authentic documents

if the complainant's claims are based upon these documents.'"  Hartig, 836 F.3d at 268, 273

(quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)).  A "document integral to or

explicitly relied upon in the complaint may be considered without converting the motion to

dismiss into one for summary judgment."  Angstadt v. Midd–West Sch. Dist., 377 F.3d 338, 342

(3d Cir. 2004) (citation and internal quotation marks omitted).  In other words, a district court

"may consider an undisputedly authentic document that a defendant attaches as an exhibit to a

motion to dismiss if the plaintiff's claims are based on the document."  Pension Ben. Guar. Corp.

v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  "Otherwise, a plaintiff with a

legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive

document on which it relied."  Id. (citing Goodwin v. Elkins & Co., 730 F.2d 99, 113-14 (3d Cir.

1984) (Becker, J., concurring)).

TUH acknowledges that the Letter of Agreement attached to the dismissal motions is an

authentic copy of the written agreement pled in TUH's Complaint.  The Complaint asserts that

Amtrak's payment of $2,754,228.49 for the inpatient hospital services provided to 13 of the

injured passengers that TUH treated, other than A.L., was made "pursuant to the terms" of a

"written agreement" signed by TUH and RRA.  Second Am. Compl. ¶¶ 12, 14, 24-25.  The

Complaint asserts that pursuant to that "agreement," either Amtrak or RRA and MCMC are

obligated to pay the remaining balance of $1,628,095.28.  Id. ¶¶ 12-15, 21-22, 24-25, 28.  In response to the dismissal motions, TUH identified the pled agreement as the "Letter of Agreement," signed by TUH and RRA on October 23, 2015.  TUH Resps. (ECF 40 at 3, 5-7; ECF 41 at 3, 5-8).  Accordingly the Letter will be treated as part of the dismissal record, without converting the dismissal motions into ones for summary judgment.

TUH does not contest the authenticity of the emails that are attached to Amtrak's dismissal motion.  TUH does not mention the emails at all.  However, the emails document communications, some of which support and some which are directly at odds with the Complaint's assertions and factual allegations.  See, e.g., Second Am. Compl. ¶¶ 10-13, 24-25, 28.  The question as to whether the emails should be part of the dismissal record need not be reached.  The Complaint can be evaluated without the emails.

C.     The Complaint Does Not Allege an Enforceable Contract

To determine whether TUH's Complaint meets the pleading standard, the analysis starts by outlining the elements that must be pled in order to state a claim to relief—here, the elements that TUH must plead and prove for an actionable breach of contract claim.  Bistrian, 696 F.3d at 365; Santiago, 629 F.3d at 130.  Under Pennsylvania law, a plaintiff suing for breach of contract must plead and prove "'(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract[,] and (3) resultant damages.'"  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  "The necessary material facts that must be alleged for such an action are simple:  there was a contract, the defendant breached it, and plaintiffs suffered damages from the breach."  McShea v. City of Philadelphia, 995 A.2d 334, 339-40 (Pa. 2010); accord Donaldson v. Davidson Bros., Inc., 144 A.3d 93, 103 (Pa. Super. Ct. 2016).

"It is basic contract law that for there to be an enforceable contract, 'the parties themselves must agree upon the material and necessary details of the bargain.'" Peck v. Delaware Cty. Bd. of Prison Inspectors, 814 A.2d 185, 191 (Pa. 2002) (quoting Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)). A contract exists only if there was an offer, acceptance, and exchange of consideration. Pa. Workers' Comp. Judges Prof'l Ass'n v. Exec. Bd. of Commonwealth, 39 A.3d 486, 493 (Pa. Commw. Ct. 2012), aff'd, 66 A.3d 765 (Pa. 2013); Mundie v. Christ United Church of Christ, 987 A.2d 794, 801 (Pa. Super. Ct. 2009), appeal denied, 14 A.3d 829 (Pa. 2010). As ruled by our Court of Appeals, contract formation under Pennsylvania law requires: "(1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009).

Having identified the elements of TUH's claim for breach of contract, the next step is to "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth,'" Santiago, 629 F.3d at 130 (quoting Iqbal, 556 U.S. at 678), and then "peel away those allegations," Bistrian, 696 F.3d at 365. TUH's Complaint contains the following conclusions that will be disregarded.

The Complaint only concludes that there was an enforceable agreement. The Complaint asserts that on October 23, 2015, "RRA and TUH signed a written agreement," and RRA and MCMC "entered into said agreement." Second Am. Compl. ¶¶ 12-13, 15, 21. The Complaint asserts that Amtrak authorized RRA and MCMC "to enter into the agreement," and "Amtrak is bound by the agreement." Id. ¶ 28. Alternatively, it is asserted, even if Amtrak did not authorize RRA and MCMC "to enter into the agreement," RRA and MCMC "are liable to TUH for their unauthorized conduct." Id. ¶¶ 13, 15, 17. And "Amtrak ratified" and "became bound by the

terms of the agreement." Id. ¶¶ 24-25.  The Complaint asserts that Amtrak paid "TUH $2,754,228.49 under said agreement," and that "TUH has suffered a financial loss of $1,628,095.64 . . . under the terms of the October 23, 2015 agreement." Id. ¶¶ 14-15, 21-22. The Letter of Agreement does not add factual content to the Complaint's conclusory assertion of an enforceable agreement.  The Letter, just like the Complaint, is devoid of any factual content that would support a reasonable inference of an offer, acceptance, and consideration–the essential elements for an enforceable contract.

The "test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986) (citing Lombardo, 123 A.2d at 666).  An offer is "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Cobaugh v. Klick–Lewis, Inc., 561 A.2d 1248, 1249 (Pa. Super. Ct. 1989) (citing Restatement (Second) of Contracts § 24).  "It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made.  An offer must be intentional, definite, in its terms and communicated; otherwise, no meeting of the minds can occur." Stumpp v. Stroudsburg Mun. Auth., 658 A.2d 333, 335 (Pa. 1995).

The Letter of Agreement identifies TUH and Amtrak as the "Parties."  The Letter recites "the agreement of the Parties" with respect to the services and charges "listed on Exhibit A." The Letter does not memorialize reciprocal promises by the Parties.  Instead, the Letter recites one promise that Amtrak "shall pay to TUH . . . $4,382,324.13" for the services and charges listed on Exhibit A, and the Letter labels that sum the "Settlement Amount."  Exhibit A then labels a column of figures with the heading, "Amtrak Settlement offer (75% chgs)."  The

labels—"Settlement" and "Settlement offer"—are conclusory.  Neither the Letter nor its Exhibit A provides any information as to who offered what to whom, how, when, or where.  Neither the Letter nor its Exhibit A says what rights and liabilities are being settled and compromised by whom.  At best, the Letter recites a unilateral promise purportedly made by Amtrak, offering to pay the stated sum of money, "$4,382,324.13."

The Complaint as well asserts a unilateral promise to pay—whether made by Amtrak or instead, made by RRA and MCMC.  The Complaint then concludes that the promise formed an enforceable contract upon RRA's signing of the Letter, which conferred instant liability on Amtrak or on RRA and MCMC to pay TUH the sum of $4,382,324.13 for all 14 patients that TUH treated.  But this is not enough to form a contract.  Our Court of Appeals instructs:

> Unlike bilateral contracts, which are premised on reciprocal promises, "unilateral contracts . . . involve only one promise and are formed when one party makes a promise in exchange for the other party's act or performance.  Significantly a unilateral contract is not formed and is, thus, unenforceable until such time as the offeree completes performance."

Giant Eagle, Inc. v. Comm'r Internal Revenue, 822 F.3d 666, 673 (3d Cir. 2016) (quoting First Home Sav. Bank, FSB v. Nernberg, 648 A.2d 9, 14 (Pa. Super. Ct. 1994) (internal citations omitted)); accord Cobaugh, 561 A.2d at 1249-50.  See also Pacitti v. Macy's, 193 F.3d 766, 774-75 (3d Cir. 1999) (a unilateral promise results in an enforceable contract if the offeree performs the required action before the offer is withdrawn).

As pled here, the promise by Amtrak does not specify or request any performance by TUH.  The Complaint and Letter are silent as to how TUH understood that it could accept the pled offer by Amtrak and collect the promised money simply by performing a task specified by the offer.  Importantly, the Complaint and Letter are also silent as to any performance by TUH that would be exchanged for Amtrak's promise to pay money, which would be the consideration for Amtrak's promise.  TUH's brief only concludes that the "term 'settlement' necessarily

implies that the parties have a bargained-for-exchange that constitutes consideration."  TUH Resp. (ECF 41 at 5-6).  However, consideration is "an essential element of an enforceable contract."  Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 128 (Pa. 1940).  "The requirement of consideration as an essential element of a contract is nothing more than a requirement that there be a bargained for exchange."  Cobaugh, 561 A.2d at 1250.  "Consideration confers a benefit upon the promisor or causes a detriment to the promise."  Id. (citing Cardamone v. Univ. of Pittsburgh, 384 A.2d 1228, 1232 n.6 (Pa. Super. Ct. 1978)).  Neither the Letter nor its Exhibit A nor the Complaint contains factual content that would permit a reasonable inference of a bargained for exchange between TUH and RRA or MCMC, or between TUH and Amtrak.

In addition, the Complaint does not give rise to a plausible inference that TUH suffered any detriment at the request of Amtrak.  Although TUH argues that upon signing the Letter of Agreement, it gave up rights to recover its charges from the injured passengers or their insurers, none the asserted bases for this contention is well-grounded in fact or law.  See TUH Resp. (ECF 41 at 6, 8 (asserting that "TUH gave up any right to collect some greater portion of its charges" and "the hospital cannot seek any payment from any other source").  That TUH gave up the right to recover from Medicare for A.L.'s treatment was caused by TUH's admitted failure to file a timely claim with Medicare.  See TUH Resp. (41 at 6, 8 n.5).  TUH did not give up or forbear anything whatsoever in exchange for the pled promise by Amtrak to pay $4,382,324.13 for the inpatient hospital services provided to 14 of the injured passengers, or by Amtrak's payment of $2,754,228.49 for the inpatient hospital services provided to 13 of the injured passengers.

The Complaint is devoid of any well-pled factual allegations supporting a reasonable inference of an offer, acceptance, or consideration.  The Complaint only asserts the existence an "agreement," and then concludes that the "agreement" formed an enforceable contract.  Again,

"naked assertions devoid of further factual enhancement" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statement," must be disregarded. Iqbal, 556 U.S. at 677-78.  The pled "agreement" is not entitled to a presumption of truth, and the pled contract will be dismissed.

Furthermore, the Complaint does not raise a reasonable expectation that discovery will reveal an enforceable contract.  Where there are well-pled factual allegations, their veracity is assumed, and then it must be determined "'whether they plausibly give rise to an entitlement to relief.'"  Bistrian, 696 F.3d at 365 (quoting Iqbal, 556 U.S. at 679 and citing Argueta, 643 F.3d at 73); Santiago, 629 F.3d at 130.  Here, the well-pled allegations of the Complaint more plausibly give rise to the conclusion that there was no contract at all.

The Complaint alleges, and the parties do not dispute, the following facts, which are entitled to a presumption of truth.  During May 13, 2015, through July 28, 2015, TUH provided inpatient services to 14 of the injured passengers, including the passenger A.L.  More than two months later, on October 23, 2015, RRA's representative signed the Letter of Agreement. Amtrak has not paid TUH the demanded sum of $1,628,095.64 for inpatient hospital services that TUH provided to A.L.  Amtrak paid TUH the sum of $2,754,228.49 for the inpatient hospital services that TUH provided to 13 of the injured passengers, other than A.L.

"It is too well-settled to require citation that generally for an act to constitute consideration it is essential that it or the promise to do it be simultaneous with the execution of the contract."  In re Lueders' Estate, 164 F.2d 128, 135 (3d Cir. 1947); Kilborn v. Pyne, 279 F. 864, 865-66 (3d Cir. 1922) (holding that services rendered by the defendant in the past were not consideration for the plaintiff's subsequent promise to relieve the defendant of his liability on a note).  Services rendered prior to the execution of an agreement "furnish no basis for holding that

17

there was a binding legal agreement since past consideration is insufficient." Cardamone, 384 A.2d at 1232. Accord Blackmon v. Iverson, 324 F. Supp. 2d 602, 611-12 (E.D. Pa. 2003) (applying Pennsylvania law and holding that "past consideration is insufficient to create a binding contract").

TUH sues to recover its charges for inpatient hospital services that TUH provided to the injured passengers before the Letter of Agreement was signed—that is, before the pled contract was formed. The Complaint does not allege that Amtrak bargained for the performance of the services by TUH. The Complaint does not allege that TUH provided those services to the injured passengers in exchange for Amtrak's promise to pay TUH's charges for treating the patients. The Complaint is devoid of any allegation that the services were part of any bargaining process by anyone. Accordingly, the inpatient hospital services provided by TUH prior to formation of the pled agreement constitute past consideration, and therefore, as a matter of law, those inpatient hospital services are inadequate to support a claim for breach of contract.

Amtrak's payment of $2,754,228.49 is consistent with a voluntary, gratuitous payment. "'If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract.'" Pennsy Supply, Inc. v. Am. Ash Recycling Corp., 895 A.2d 595, 601 (Pa. Super. Ct.), appeal denied, 907 A.2d 1103 (Pa. 2006) (quoting Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003), appeal denied, 849 A.2d 242 (Pa. 2004) (quoting Stelmack, 14 A.2d at 128-29) (citations omitted)). Here, the Complaint "pleads facts that are 'merely consistent with' a defendant's liability," and it "'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

D.     The Complaint Does Not Allege A Plausible Agency Relationship

The Complaint asserts that Amtrak "retained" RRA and MCMC to "act as its agents to negotiate the payment of charges incurred" by the injured passengers.  Second Am. Compl. ¶ 9. The Complaint asserts that on October 23, 2015, "TUH and RRA signed a written agreement," later identified by TUH as the Letter of Agreement.  Id. ¶ 12.  The Complaint asserts that "if RRA and MCMC had . . . Amtrak's authority to enter into the agreement with TUH," then "Amtrak is bound by the agreement and it is obligated to pay TUH the $1,628,095.64 that is due under its terms."  Id. ¶ 28.  In briefing, TUH does not argue or support the assertion that Amtrak is liable as a principal for the acts of its agents, RRA and MCMC.  Nonetheless, the Complaint asserts that RRA's signing of the Letter Agreement should be imputed to Amtrak.  Id. ¶¶ 12, 28.

As Pennsylvania's Supreme Court ruled, the "imputation doctrine recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority."  Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. Price Waterhouse Coopers, LLP, 989 A.2d 313, 333(Pa. 2010).  The imputation doctrine presumes that a principal has "selected and delegated responsibility" to its agents and "creates incentives for the principal to do so carefully and responsibly."  Id.  The doctrine protects a party who conducts business with the principal through its agents "believing the agent's conduct is with the authority of his principal."  Id.  However, before the words or acts of one person can be imputed to another, there must be an agency relationship between them. Pennsylvania law requires the party asserting an agency relationship to plead and prove:

> "(1) 'the manifestation by the principal that the agent shall act for him," (2) 'the agent's acceptance of the undertaking[,]' and (3) 'the understanding of the parties than the principal is to be in control of the undertaking.'"

Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 299 (E.D. Pa. 2008) (quoting

Scott v. Purcell, 415 A.2d 56, 60 (Pa. 1980) (quoting Restatement (Second) of Agency § 1 cmt. b

(1958)).

The Complaint's assertion that RRA and MCMC were Amtrak's "agents" is a legal

conclusion.  Second Am. Compl. ¶ 9.  The Complaint alleges as a fact only that Amtrak

"retained" RRA and MCMC to "negotiate the payment of charges incurred" by the injured

passengers.  Id.  Otherwise, the Complaint is devoid of any factual allegations that suggest

Amtrak was a principal in an agency relationship with RRA and MCMC.

Even assuming the veracity of the pled undertaking by RRA and MCMC "to negotiate

the payment of charges," that undertaking is consistent with an independent contractor's work.

The defining characteristic of an independent contractor is that "'the person engaged in the work

has the exclusive control over the manner of performing it, being responsible only for the

result.'"  Jones v. Century Oil U.S.A., Inc., 957 F.2d 84, 86 (3d Cir. 1992) (quoting Feller v.

New Amsterdam Cas. Co., 70 A.2d 299, 300 (Pa. 1950)); accord Moon Area Sch. Dist. v.

Garzony, 560 A.2d 1361, 1367-68 (Pa. 1989).  On the facts pled here, it is just as likely that

MCMC was responsible for producing a result—a negotiated proposal for payment of a bill.

Amtrak controlled which bills would be submitted to MCMC for negotiation and which bills

would be paid.  But the Complaint does not suggest that Amtrak had the right to direct the

manner in which the bills were negotiated.  And no facts are pled showing that Amtrak delegated

to RRA and MCMC the authority to enter into binding promises to pay any proposals.  Again,

"[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it

'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Iqbal, 556

U.S. at 678 (quoting Twombly, 550 U.S. at 557 (alteration omitted)).

Alternatively, the Complaint again starts from the assertion that Amtrak "retained" RRA and MCMC to "act as its agents."  Second Am. Compl. ¶ 9.  The Complaint then alleges that on October 22, 2015, Amtrak instructed RRA and MCMC that they "were not authorized to enter into" the Letter of Agreement, but on October 23, 2015, RRA signed the Letter.  Id. ¶¶ 11, 12.  The Complaint concludes:  "If . . . RRA and MCMC exceeded the scope of their authority for Amtrak, RRA and MCMC are liable to TUH for their unauthorized conduct."  Id. ¶ 17.  TUH maintains that the "cause of action against RRA and MCMC is premised on the rule that imposes liability on an agent who acts without the authority of its principal."  TUH Resp. (ECF 41 at 3).

As ruled above, the Complaint does not permit a reasonable inference to be drawn that either RRA or MCMC, or both, were in an agency relationship with Amtrak.  Also as ruled above, the Complaint does not permit a reasonable inference to be drawn that there was an enforceable contract—either between TUH and Amtrak, or between TUH and either RRA or MCMC, or both.  Consequently, the Complaint does not present a plausible claim that RRA and MCMC are individually liable to TUH for breach of contract.

E.       The Complaint Does Not Plausibly Allege That Amtrak Ratified a Contract

The Complaint once again starts from the assertion that Amtrak "retained" RRA and MCMC to "act as its agents."  Second Am. Compl. ¶ 9.  The Complaint then alleges that on October 22, 2015, Amtrak instructed RRA and MCMC that they "were not authorized to enter into" the Letter of Agreement, but on October 23, 2015, RRA signed the Letter.  Id. ¶¶ 11, 12.  The Complaint concludes:  "Amtrak ratified the unauthorized conduct by . . . RRA and MCMC when Amtrak paid plaintiff $2,754,228.49 pursuant to the terms of that agreement."  Id. ¶ 24.

Under Pennsylvania law, "a principal is generally not liable on account of acts committed by an agent outside the actual or apparent scope of his authority unless the acts are subsequently

ratified by the principal." In re Bankers Trust Co., 752 F.2d 874, 882 (3d Cir. 1985) (citing

Elderton State Bank v. Citizen's Ins. Agency & Mortg. Co., 86 Pa. Super. 85, 86-87 (1925)).

Ratification can validate a contract. Senyshyn v. Karlak, 299 A.2d 294, 297 (Pa. 1973); In re

Trust of Coho, 219 A.2d 657, 658-59 (Pa. 1966); Restatement (Second) of Contracts §§ 3, 380

(1981). "Ratification is the affirmance of a prior act done by another, whereby the act is given

effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01

(2006). See also Advanced Disposal Servs. East, Inc. v. NLRB, 820 F.3d 592, 602-03 (3d Cir.

2016) ("Ratification to be effective imports knowledge of all materials facts on the part of those

ratifying.") (quoting Toebelman v. Missouri–Kansas Pipe Line Co., 130 F.2d 1016, 1022 (3d Cir.

1942)); Bauman v. Eschallier, 184 F. 710, 711 (3d Cir. 1911) ("No one can be held to have

ratified the unauthorized act of an agent unless he has knowledge of all the material facts.").

The Complaint only concludes that Amtrak ratified RRA's unauthorized signing of the

Letter of Agreement. No facts are alleged that suggest Amtrak was willing to go forward by

paying the total sum of $4,382,324.13 that was recited in the Letter and its Exhibit A. No facts

are alleged that suggest Amtrak knew anything about RRA's negotiations or the Letter until this

dispute arose. No facts are alleged suggesting that Amtrak manifested an intention to affirm any

words or conduct by either RRA or MCMC in their negotiations with TUH. To the contrary, the

Complaint acknowledges that "Amtrak allegedly told . . . RRA and MCMC they were not

authorized to enter into the proposed agreement and that Amtrak would agree to pay only

$2,754,228.49" for the 13 injured passengers other than A.L. Second Am. Compl. ¶ 11. No

detail is pled as to how or when TUH became aware of Amtrak's position. Amtrak contends that

on October 26, 2015, the next business day following RRA's signing of the Letter on October

23, 2015, RRA's representative, Salas, informed TUH that Amtrak disavowed and repudiated

any obligation to pay anything for A.L.'s medical services.  October 26, 2015 was the purported effective date of the Letter.  The Complaint itself raises questions as to whether the whole story as to what happened has been pled.  See Second Am. Compl. ¶¶ 10-12.

The Complaint alleges, and the parties do not dispute, that Amtrak paid $2,754,228.49 to TUH for 13 of the hospital inpatients that TUH treated.  But Amtrak's payment of that sum alone does not permit a reasonable inference that Amtrak intended to affirm the Letter of Agreement's recitation of a promise to pay a greater sum—that is, a sum that included TUH's charges for inpatient hospital services for A.L.  In short, "[f]actual allegations must be enough to raise a right to relief above the speculative level," which the Complaint fails to do.  Twombly, 550 U.S. at 555.  And once again, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557 (alteration omitted)).

In addition, TUH's ratification theory fails as a matter of law.  The essential facts required for application of the theory are not to be found in the Complaint.  As ruled above, the Complaint does not permit a reasonable inference to be drawn that Amtrak and either RRA or MCMC, or both, were in an agency relationship.  As also ruled above, the Complaint does not permit a reasonable inference to be drawn that there was an enforceable contract—either between TUH and Amtrak, or between TUH and either RRA or MCMC, or both.

F.     The Complaint Does Not Plausibly Allege Misrepresentation

The Complaint asserts "RRA and MCMC represented to TUH that they had Amtrak's authority to act on Amtrak's behalf as Amtrak's agents."  Second Am. Compl. ¶ 13.  The Complaint asserts that "RRA and MCMC misrepresented that they had authority to act for Amtrak when they entered into the October 23, 2015 agreement," that is, the Letter of

Agreement.  Id. ¶ 21.  TUH maintains that under Stiteler v. Ditzenberger, 45 Pa. Super. 266

(1910), Kennedy v. Faush, 268 A.2d 209, 211 (Pa. Super. Ct. 1970), and the Restatement

(Second) of Agency § 329 (1958), RRA's and MCMC's "misrepresentation" of authority renders

them individually liable under the Letter to pay TUH the outstanding sum of $1,628,095.64 for

the inpatient hospital services provided to A.L.  Id. ¶¶ 18-21.

     The Complaint's citation to authority will be disregarded.  The "tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

Iqbal, 556 U.S. at 678.  In addition, the Complaint only asserts that RRA and MCMC

"represented" that they had Amtrak's authority to act as its agents and they "misrepresented"

their authority.  These assertions are conclusory.  Otherwise, the Complaint is silent as to who

said what to whom, when, where, how, or why.  These assertions will be disregarded because

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).

     Furthermore, the Complaint does not raise a reasonable expectation that discovery will

reveal an actionable misrepresentation—whether the theory is cast as one for breach of an

implied warranty of authority or breach of a tort duty.  As ruled above, the Complaint does not

permit a reasonable inference to be drawn that there was an enforceable promise—an essential

element for cause of action based on breach of implied warranty.  And the Complaint does not

allege any facts suggesting that TUH reasonably relied to its detriment upon any specific

statements or conduct by RRA and MCMC.  The Complaint does not contain any factual

allegations as to how TUH was damaged, injured, or otherwise prejudiced by words or conduct

of RRA and MCMC.  TUH maintains that "the most palpable form of prejudice visited upon

TUH . . . is a loss of the bargain"—that is, a contract right to receive the sum of $4,382,324.13,

as recited in the Letter and its Exhibit A.  TUH Resp. (ECF 41 at 8, 7-8).  But the Complaint does not plausibly suggest that TUH ever had an enforceable contract right to recover that sum. The Complaint simply does not present a plausible claim for misrepresentation on any cognizable cause of action.

IV.    <u>CONCLUSION</u>

TUH has had three opportunities and ample time to plead a plausible case against Amtrak, RRA, and MCMC, but has not done so.  At this juncture, it is fair to conclude that TUH has not done so because TUH cannot put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary elements for a viable cause of action. Accordingly, the Complaint will be dismissed with prejudice.

An Order accompanies this Memorandum.

BY THE COURT

/s/ Legrome D. Davis

Legrome D. Davis, J.